# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

SHARON LEE TENNYSON,

       Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

       Defendant.

No. C13-4035-MWB

**REPORT AND
RECOMMENDATION**

---

    Plaintiff Sharon Tennyson seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income benefits (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Tennyson contends that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period of time. For the reasons that follow, I recommend that the Commissioner's decision be affirmed.

## I.  BACKGROUND

    Tennyson was born in 1967 and has a GED. AR 48. She previously worked as a cook and fast food worker. AR 275. Tennyson protectively filed for SSI on April 12, 2010, alleging disability beginning on November 14, 2006,[1] due to bipolar disorder, posttraumatic stress disorder (PTSD), depression and attention deficit hyperactivity disorder (ADHD). AR 12, 187. Her claims were denied initially and on reconsideration.

---

[1] Tennyson later amended the alleged disability onset date to August 19, 2009. AR 12, 47-48.

AR 96-98.  Tennyson requested a hearing before an Administrative Law Judge (ALJ). AR 115-16.  On December 12, 2011, ALJ Jan Dutton held a hearing via video conference during which Tennyson and a vocational expert (VE) testified.  AR 32-79.

On January 23, 2012, the ALJ issued a decision finding Tennyson not disabled since August 19, 2009.  AR 12-26.  Tennyson sought review by the Appeals Council, which denied review on March 14, 2013.  AR 1-3.  The ALJ's decision thus became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

On April 30, 2013, Tennyson filed a complaint in this court seeking review of the ALJ's decision.  This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B).  The parties have briefed the issues and the matter is now fully submitted.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet

the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of

production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III. SUMMARY OF ALJ'S DECISION

The ALJ made the following findings:

(1) The claimant has not engaged in substantial gainful activity since August 19, 2009, the alleged onset date (20 CFR 416.971 *et seq.*).

(2) The claimant has the following severe impairments: bipolar disorder/depression; posttraumatic stress disorder; attention deficit hyperactivity disorder; and history of substance abuse in remission (20 CFR 416.920(c)).

(3) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she requires unskilled (SVP 1-2) work that is routine and repetitive and does not require extended concentration or attention and does not require her to set goals or deal with job changes; and she should avoid constant, frequent, or intense social interaction with coworkers, supervisors, or the general public, but she could handle brief, superficial, occasional interaction.

(5) The claimant has no past relevant work (20 CFR 416.965).

(6) The claimant was born on April 14, 1967 and was 42 years old, which is defined as a younger individual age 18-49, on the date the alleged onset date [sic] (20 CFR 416.963).

5

(7)     The claimant has at least a high school education (GED) and is able to communicate in English (20 CFR 416.964).

(8)     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(9)     Step 5: Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

(10)     The claimant has not been under a disability, as defined in the Social Security Act, since August 19, 2009, the alleged onset date (20 CFR 416.920(g)).

AR 14-26. At Step Two, the ALJ found all of the claimed impairments (bipolar disorder/depression, posttraumatic stress disorder, attention deficit hyperactivity disorder and history of substance abuse in remission) to be severe, as they cause more than minimal limitations in Tennyson's ability to perform basic work-related activities. AR 14. She noted that there was no evidence of substance abuse during the relevant period.

At Step Three, the ALJ found that none of Tennyson's impairments, individually or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 15. She considered listings 12.04 (affective disorders), 12.06 (anxiety related disorders) and 12.09 (substance addiction disorders). With regard to those listings, the ALJ first analyzed the "paragraph B" criteria, noting that to satisfy these criteria the impairments must cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation.[2] *Id.* A "marked"

---

[2] Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 CFR Part 404, Subpart P, Appendix 1. Repeated episodes of decompensation, each of extended duration, means 3 episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

6

limitation is one that is more than moderate but less than extreme. *Id.* The ALJ found that Tennyson has mild restrictions concerning activities of daily living, moderate difficulties in social functioning and moderate difficulties with regard to concentration, persistence or pace. *Id.* The ALJ also found that Tennyson had experienced no episodes of decompensation which have been of extended duration. *Id.* Therefore, the ALJ found the paragraph B criteria were not satisfied. *Id.* She also considered the "paragraph C" criteria and found that the evidence failed to establish those criteria, as well. *Id.*

At Step Four, the ALJ provided a RFC assessment and found that Tennyson could perform a full range of work at all exertional levels, but with the following nonexertional limitations: unskilled (SVP 1-2) work[3] that is routine and repetitive, does not require extended concentration or attention, does not require her to set goals or deal with job changes and avoids constant, frequent, or intense social interaction with coworkers, supervisors, or the general public. AR 16. She added that Tennyson would be able to handle brief, superficial and occasional interaction. *Id.*

In explaining these findings, the ALJ first considered Tennyson's statements concerning the disabling effects of her impairments. She noted that Tennyson claims she is unable to work because her mental symptoms make it difficult for her to complete tasks, get along with others and handle stress. *Id.* She also has poor concentration. Tennyson's daily activities include simple household chores and helping her daughter get ready for school. She also spends time on the computer and reads during the day. *Id.* Tennyson's last job was in 2005 at a fast food restaurant. She usually quits jobs due to frustration. She has attempted vocational rehabilitation and worked briefly at Goodwill

---

[3] "SVP" refers to Specific Vocational Preparation, defined in Appendix C of the Dictionary of Occupational Titles as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." A position with an SVP of 1 requires only a short demonstration, while a position with an SVP of 2 requires vocational preparation of "[a]nything beyond short demonstration up to and including 1 month." *See* Dictionary of Occupational Titles, Appendix C.

and volunteering for an elderly man. Tennyson quit the Goodwill job because she felt "out of sorts" and stopped volunteering when she learned the elderly man she was helping was ineligible for services. AR 17. She stated that her current treating provider, Collette McCullough, ARNP, had restricted her to working 15 to 19 hours per week[4] and she could not work more than this because her impairment caused "cycling" in which she is very manic and motivated three days a month, but then depressed and unmotivated once or twice a month. *Id.* On her "down days" Tennyson stated she has no energy and does not leave home. She has difficulty engaging with other people, is easily angered and has difficulty sustaining tasks.

The ALJ also considered the medical evidence and noted that Tennyson has a longstanding history of mental health treatment. However, the ALJ noted there were contradictions between Tennyson's statements and the medical evidence. Approximately a year before her alleged onset date of August 19, 2009, Tennyson's treating source noted she had good energy, motivation, memory and sleep. AR 18. Tennyson was also able to concentrate, focus and make good decisions. *Id.* In January 2009, she complained of boredom and her therapist suggested she find a part-time job. In May 2009, she had recently been denied disability in a previous application and told her therapist that she had always wanted to work part-time, but her lawyer advised her not to.

On August 19, 2009 (her alleged onset date), Tennyson began seeing McCullough for medication management. Tennyson reported her medication worked very well and she maintained a stable mood through December 2009, when her doctor stopped her medication due to a rash. AR 19. In January 2010, Tennyson reported feeling anxious and sad but her insight and judgment were good and her attention and focus was adequate. She was started on new medication.

---

[4] The ALJ noted there was no evidence of a restriction from Vocational Rehabilitation in the record. AR 24. This opinion from McCullough was later added to the record and presented to the Appeals Council. AR 526-31.

In April 2010, Tennyson reported to McCullough that she had been doing well and things were stabilizing. *Id.* Her mood was sad on exam, but she was not facing any significant problems with depression or anxiety. In May, Tennyson responded well to an increase in her medication, had good attention and a stable mood. *Id.* In June, Tennyson's mood was still stable, but she had problems with anxiety and sleeping so Seroquel was added to her medications. In July 2010, Tennyson had been involved in a physical altercation trying to defend a friend and was hit on the head. She had isolated herself in her apartment for a week, but then began going out more and applying for jobs. *Id.* McCullough noted her anxiety was under control and her medication seemed to be working.

In September 2010, Tennyson began volunteering at a school. Her ADHD medication was increased, but her mood was good and her thought processes were logical, organized and goal-directed. *Id.* In January 2011, Tennyson reported she had not refilled her medication due to loss of funding. She explained she could not afford the dollar co-pay because she was trying to buy food. *Id.* In February, Tennyson was looking for jobs. In March, McCullough noted her mood was stable and her attention and focus were adequate. Tennyson had recently visited Wyoming where she was involved in a difficult domestic situation with her daughter's biological father. Her mood was a little sad on exam, she still had a bright affect and adequate attention and focus. *Id.* In July 2011, when Tennyson was considering moving to Wyoming to be near her older daughter, McCullough remarked that Tennyson's sadness was "more situational" and she had a lot of time on her hands. AR 19-20.

Tennyson also saw Clayton Toddy, Psy.D., beginning in December 2009 for cognitive behavioral psychotherapy. On August 5, 2010, Dr. Toddy diagnosed PTSD, bipolar disorder, obsessive-compulsive disorder, ADHD, personality disorder, not otherwise specified with borderline traits and polysubstance dependence in sustained

remission.  AR 20.  He assigned a global assessment of functioning (GAF) score of 56.[5] *Id.*  Tennyson told Dr. Toddy she was working with Vocational Rehabilitation and Promise Jobs to find a job.  *Id.*  Two weeks later, Dr. Toddy found no remarkable findings on exam.  Her attention and concentration were intact and her GAF score had increased to 58.  Two weeks later it dropped back to 56.  On October 28, 2010, Dr. Toddy noted Tennyson was depressed and anxious regarding recent stressors and she experienced similar symptoms associated with family matters over the next few months. *Id.*

In March 2011, Tennyson's behavior was agitated and anxious on exam, she was tearful and manic and her mood was depressed.  Tennyson had been off her medication for two months for financial reasons.  Despite being off her medication, Dr. Toddy noted her memory was intact and her thought process was coherent.  By April 7, 2011, she was back on her medication and Dr. Toddy noted she was more emotionally stable.  Tennyson visited Wyoming again during the next couple of months with no difficulties.  In August 2011, she attended Goodwill training but limited herself to working one to two hours several times a week due to her symptoms.  On exam, her mood was depressed, but her attention and concentration were only mildly impaired.  *Id.*

The ALJ discredited Tennyson for several reasons.  AR 21.  She found Tennyson had made no effort to work after being denied Social Security from an earlier application and only sought assistance through Vocational Rehabilitation in June 2009 when she re-applied for Social Security.  *Id.*  She discredited Tennyson's alleged inability to work around others based on the bus rides she took to Wyoming, which required extended periods of time around other people.  The ALJ also found Tennyson's allegations were

---

[5] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

not supported by the medical evidence or her daily activities. For instance, McCullough noted that Tennyson had good attention, concentration, insight and judgment at nearly every appointment and that treatment notes from McCullough and Dr. Toddy revealed her symptoms were well-managed when she was compliant with medication. *Id.* As for her daily activities, the ALJ noted Tennyson was able to care for her child, ride the bus, attend to personal grooming and simple household chores, use the computer, spend time reading during the day and make extended trips to Wyoming. The ALJ was also not persuaded that Tennyson's frequent attempts at work (either volunteer or paid) ended due to her inability to tolerate day-to-day stress. Specifically the ALJ noted this assertion was contradicted by Tennyson's ability to care for her daughter and her frequent bus trips to Wyoming where she would sometimes stay for three weeks to one month.

The ALJ also considered the opinion evidence. She found the opinions of the state agency psychological consultants were the most consistent with the overall record. AR 22. They opined that Tennyson would be capable of complex tasks that do not require intense concentration, extensive social interaction or frequent changes in routine. They later changed their opinion and found that Tennyson was only able to perform simple and routine work. *Id.* The ALJ noted that McCullough had not provided an opinion, but her observations in treatment notes did not indicate that Tennyson was disabled. *Id.* Dr. Toddy had provided an opinion on January 15, 2010, to determine Tennyson's eligibility for Vocational Rehabilitation Services. He remarked that Tennyson had difficulty sustaining attention and concentration and that "anger dyscontrol" was affecting her relationships. The ALJ noted he had only seen Tennyson for two appointments and found his opinion inconsistent with his comment that Tennyson maintained attention during those two appointments. She gave this opinion little weight.

Dr. Toddy also provided opinions on August 29, 2011, in a Mental Capacity Evaluation and on October 18, 2011, in a Mental RFC Questionnaire. His opinions were based, in part, on questionnaires completed by Tennyson. *Id.* In the Mental Capacity Evaluation, he found Tennyson had slight restrictions in activities of daily living, marked

11

difficulty in maintaining social functioning and constant deficiencies in concentration, persistence and pace, which resulted in failure to complete tasks in a timely manner and repeated episodes of decompensation in work-like settings. AR 23, 494-96. He assigned a GAF score of 41 to 50, indicating serious impairment in social and occupational functioning and he opined that her impairment "impedes her ability to work and to sustain gainful employment." *Id.* In his RFC Questionnaire, Dr. Toddy remarked that Tennyson could not handle stress in a work environment and her impairments caused moderate fatigue. He described her ability to handle many work-related functions as "poor to none." He thought she would be absent from work four or more times per month. *Id.*

The ALJ gave these opinions little weight. She reasoned that Tennyson did not see Dr. Toddy until approximately one year after her alleged onset date. Dr. Toddy assigned a GAF score of 56 then, a score of 58 two weeks later, and a score of 56 two weeks after that. In March 2011, Tennyson had not kept appointments for two months or taken her medication due to lack of funds. AR 24. However, once she was back on her medication, her emotions stabilized and she was able to travel to Wyoming over the next few months. The ALJ then summarized the GAF score ranges and noted that a score of 41 to 50 was remarkably low in comparison to Dr. Toddy's observations during office visits. *Id.* The ALJ concluded that her own RFC determination was supported by the overall record which showed Tennyson had adequate attention and concentration and intact judgment and insight at most exams, good control of her symptoms when she was compliant with her medications and was able to care for her child and adequately attend to home responsibilities and appointments. *Id.*

The ALJ found Tennyson had no past relevant work. However, at Step Five she concluded Tennyson could perform other work available in the national economy given her age, education, work experience and RFC. These jobs included fast food worker, cook helper, conveyor belt production helper and housekeeping cleaner. AR 25. For these reasons, the ALJ found Tennyson had not been disabled since August 19, 2009. AR 26.

## IV.    THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645.   The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).   The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).   The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989).   The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188

(8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## V.    DISCUSSION

Tennyson argues the ALJ's decision is not supported by substantial evidence in the record as a whole for the following reasons:

> I.    The ALJ erred in discounting the opinion of Dr. Toddy, Tennyson's treating psychologist.
>
> II.    The ALJ erred in failing to consider the evidence from Collette McCullough and Iowa Vocational Rehabilitation Services that Tennyson was unable to work.
>
> III.    The ALJ erred in discounting Tennyson's symptoms and credibility

I will discuss each of these issues separately below.

### A.    Dr. Toddy's Opinion

Tennyson argues the ALJ's reasons for discounting the opinions of Dr. Toddy are not supported by substantial evidence in the record as a whole. She argues Dr. Toddy's treatment notes are consistent with his opinion that Tennyson is disabled. She further

contends that the disparity between the GAF scores can be explained by the full-scale evaluation he conducted in August 2011. Prior to that evaluation, Dr. Toddy's GAF scores were higher, but they were also based on only one-hour sessions with Tennyson.

In response, the Commissioner contends the ALJ properly discredited Dr. Toddy's opinion because it is inconsistent with his treatment notes. For example, she points out that Dr. Toddy offered no explanation for the discrepancy among GAF scores and his most recent evaluation of a GAF score between 41 and 50 conflicts with another assessment performed on the same date which indicated only mild to moderate limitations.

The Social Security regulations state, in relevant part:

> Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 416.927(d)(2) [emphasis added]. What this means is that a treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). But that opinion will be given controlling weight if it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  *Hacker*, 459 F.3d at 937.

When a treating physician's opinion is entitled to controlling weight, the ALJ must defer to the physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions.  20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005).  The ALJ must "always give good reasons" for the weight given to a treating physician's evaluation." 20 C.F.R § 404.1527(d)(2); *see also Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

Dr. Toddy provided opinions about Tennyson's work-related limitations in two separate documents - a Mental Capacity Evaluation and a Mental RFC Questionnaire. AR 494-504.  These were completed on August 29, 2011, and October 18, 2011, respectively.  The Mental RFC Questionnaire is a checklist form while the Mental Capacity Evaluation is in a written format that summarizes the scores he found using the Brief Psychiatric Rating Scale (BPRS), Psychiatric Impairment Rating Scale (PIRS) and GAF scale.  The ALJ gave Dr. Toddy's opinions little weight because she found little support in the record for the severity of limitations he identified.  AR 24.  She noted that Tennyson did not start seeing Dr. Toddy until a year after her alleged onset date.[6]  At that appointment, her GAF score was 56.  She was seeking employment and working with Vocational Rehabilitation.  Two weeks later, the ALJ noted Tennyson's GAF score

---

[6] This is an error.  The record shows Tennyson began seeing Dr. Toddy on December 21, 2009, when he was with a different clinic.  AR 478.  Dr. Toddy's treatment notes from December 2009 through August 2010 were not included in the record at the time the ALJ made her decision, but the ALJ knew Dr. Toddy had seen Tennyson before August 2010, as she discredited his January 2010 opinion by stating he had only seen Tennyson on two prior occasions.  AR 22.  I will not consider this to be a reason supporting the ALJ's evaluation of Dr. Toddy's opinion.

had improved to 58 and Dr. Toddy's exam revealed no remarkable findings. Her score returned to 56 two weeks later.

The ALJ also referred to treatment notes from March 2011, when Tennyson had gone off her medication for two months and stopped attending therapy due to financial reasons. She pointed out that Dr. Toddy's treatment notes revealed that once Tennyson resumed her medication she was more emotionally stable and was able to travel to Wyoming over the next few months. The ALJ concluded Dr. Toddy's opinion that Tennyson's GAF score was 41 to 50 was remarkably low in comparison to his observations during office visits and the fact that Tennyson had a GAF score of 65 in August 2008 and a 56 in August 2010 with no intervening incidents since being denied Social Security benefits in May 2009. AR 24.

I find that the ALJ's evaluation of Dr. Toddy's opinions is supported by substantial evidence in the record. In the RFC Questionnaire, Dr. Toddy opined that Tennyson had a "poor" ability to maintain attention and concentration for a two hour segment and "marked" limitation in maintaining concentration, persistence or pace. AR 501, 503. In the Mental Capacity Evaluation, Dr. Toddy noted Tennyson had "constant deficiencies" in concentration, persistence and pace. AR 495. In the same report, he characterized her concentration, persistence and pace as moderately impaired (although he identified marked impairments). *Id.* He found her GAF score was 41 to 50 (indicating severe impairment), although his most recent treatment notes do not indicate more severe symptoms than those reported from December 2009 through August 2010 when Tennyson's GAF scores ranged from 58 to 63.[7] AR 515-25. Dr. Toddy's treatment notes from October 2010 to the date of the RFC Questionnaire do not contain GAF scores, but also reflect little change in her symptoms. The most severe limitations Dr. Toddy observed were mild impairment in attention and concentration, although he generally found her attention and concentration to be "intact." AR 480-86, 489-93. Given these

---

[7] These treatment notes were added to the record after the ALJ made her decision.

inconsistencies, and the numerous treatment records which do not indicate severe limitations in the area of attention and concentration, it was appropriate for the ALJ to give Dr. Toddy's opinion little weight.

Dr. Toddy also found Tennyson had marked difficulty in maintaining social functioning due to anxiety, obsessive thinking and mood disorder in the Mental Capacity Evaluation. However, in the same evaluation he found only mild impairment in "role functioning in social and recreational activities" and just moderate impairment in interpersonal relationships. AR 494-95. In the Mental RFC Questionnaire, Dr. Toddy characterized her ability to maintain social functioning as "marked" and described her capacity to engage in social work-related activities as "poor." AR 501-03. However, Dr. Toddy's treatment notes reference several of Tennyson's social interactions and never mention any difficulties or inappropriate actions. Indeed, Dr. Toddy often noted his approval of the ways Tennyson dealt with others.

On September 30, 2010, Tennyson indicated she had recently had an old female friend move in with her, but had to ask her to leave when the friend was found snooping through her personal items. Tennyson had also made contact with an old friend from middle school and had "responded assertively" when he made disrespectful comments to her. AR 481. Dr. Toddy noted she had "asserted herself appropriately" in these situations. *Id.* On November 4, 2010, Tennyson explained she was having issues with a male friend in her apartment building who had complained about her. AR 483. Dr. Toddy noted she had used "appropriate assertiveness communication" in dealing with this friend and the housing issue. AR 484. On March 15, 2011, Dr. Toddy noted that Tennyson had spoken with the principal at her daughter's school and mothers of her daughter's friends regarding difficulties her daughter was having with classmates. AR 487. He noted she had been handling those situations appropriately. *Id.* In June 2011, Tennyson had returned from a four-week trip to Wyoming by bus. They visited her daughter's biological father and stayed with his mother and a friend of his before visiting Tennyson's older daughter. AR 490. In August 2011, Dr. Toddy noted Tennyson had

confronted acquaintances in her apartment regarding inappropriate behavior. AR 492. Given these treatment notes, which seem to demonstrate Tennyson's ability to engage in appropriate social interactions, the ALJ did not err by finding little evidence supported Dr. Toddy's opinion that Tennyson had "marked" limitations in the area of social functioning.

The only severe area of impairment Dr. Toddy reported was in "resilience and employability." AR 495. He noted she was markedly limited in her ability to respond appropriately to changes in the work setting and had repeated episodes of decompensation in work or work-like settings. *Id.* He also found she had decreased physical endurance and was markedly limited in her ability to understand and remember detailed instructions. *Id.* In the Mental RFC Questionnaire, Dr. Toddy found her ability to understand, remember and carry out detailed instructions was "fair" but for simple instructions her ability was "good." AR 502. He found her ability to respond appropriately to changes in a routine work setting was "poor." *Id.* Again, there is little evidence of such severe limitations in Dr. Toddy's treatment notes or other evidence in the record. When Tennyson was faced with several stressors in November 2010, Dr. Toddy remarked that she had made "several very positive decisions in the last several weeks of how she has handled her stressors." AR 484. As for her resilience, when she was able to attend the Goodwill training session, Tennyson limited herself to working one to two hours several times a week. AR 493. She also quit volunteering jobs when she found out she was not eligible to be paid. To the extent Dr. Toddy opined Tennyson was unable to work due to a complete inability to adapt to changes and understand, remember and carry out simple instructions, the ALJ appropriately found that this opinion was not supported by the record as a whole.

Dr. Toddy's opinion was credited to the extent it concluded that Tennyson would struggle with certain work-related functions. The ALJ adopted limitations to accommodate these difficulties such as unskilled (SVP 1-2) work, routine and repetitive work that does not require extended concentration or attention, work that does not require

19

her to set goals or deal with job changes and work that avoids constant, frequent or intense social interaction with coworkers, supervisors or the general public. These limitations are consistent with Dr. Toddy's treatment notes and the record as a whole, which demonstrate moderate difficulties in these areas, but not "marked" or "no useful ability to function" as Dr. Toddy noted in his RFC Questionnaire. AR 502. For these reasons, the ALJ's evaluation of Dr. Toddy's opinion is supported by substantial evidence in the record as a whole.

## B.     Collette McCullough and Iowa Vocational Rehabilitation Services

Tennyson contends the ALJ should have addressed McCullough's opinion that Tennyson was limited to working 10 to 19 hours per week.[8]  She also argues the Appeals Council should have considered a letter and closure form from Rene Eastham, a rehabilitation counselor with Iowa Vocational Rehabilitation Services, which was added to the record after the hearing.  In the letter, Eastham states she was closing Tennyson's file as "Disability too Significant to benefit from VR services" which was "demonstrated by her inability to maintain stability in her mental health enough to find employment, and her inability to even complete an assessment at Goodwill." AR 532-33.

The Commissioner argues the Appeals Council appropriately found that remand was not necessary after considering the additional evidence from McCullough and Eastham.  She contends McCullough's opinion is not a medical opinion (as defined in the Social Security regulations) and her opinion is inconsistent with her own treatment records and earlier opinions she provided.  With regard to Eastham's opinion, the Commissioner contends her opinion constitutes "other evidence" and is not supported by the medical evidence in the record.

---

[8] This evidence was added to the record after the ALJ made her decision and was considered by the Appeals Council.  AR 526-31.  As such, I will consider it as new and material evidence.  20 C.F.R. § 416.1470(b).

The regulations describe the review process for new and material evidence as follows:

> [T]he Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 416.1470(b). If the Appeals Council considers the new evidence, but declines to review the case, the court reviews the ALJ's decision to determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision. *Browning v. Sullivan*, 958 F.2d 817, 823 n.4 (8th Cir. 1992).

I find that the ALJ's decision is supported by substantial evidence in the record as a whole when considering the new evidence from McCullough and Eastham. The evidence from McCullough was used to determine Tennyson's eligibility for Vocational Rehabilitation through the Iowa Department of Human Services. AR 526-31. It consists of three checklist forms she completed in September 2009, March 2010 and July 2010. In these forms, McCullough indicates that Tennyson is limited to working 10 to 19 hours per week. The most detailed explanation she provides for this limitation is that Tennyson gets anxious and overwhelmed, has racing thoughts and her mood de-stabilizes. AR 527. She suggests Tennyson's limitations can be accommodated if she is allowed to start out slow. AR 527, 529.

This evidence does not undermine the ALJ's decision. The Commissioner correctly points out that McCullough is not an acceptable medical source. The Commissioner's regulations distinguish opinions provided by licensed physicians and psychologists from those provided by physicians' assistants, nurse practitioners and other sources. 20 C.F.R. § 416.913. The former are "acceptable medical sources" while the

latter are not. *Id.* This means that a treating nurse practitioner is not an "acceptable medical source" whose opinions are entitled to controlling weight. 20 C.F.R. § 416.913(d)(1); *see also Lacroix v. Barnhart*, 465 F.3d 881, 885–86 (8th Cir. 2006). The opinions of a nurse practitioner may still be considered, but they are not entitled to the deference afforded to medical opinions provided by a treating physician. 20 C.F.R. § 416.913(d)(1). Moreover, McCullough's opinion is not supported by an explanation or her treatment notes. *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) ("We have upheld an ALJ's decision to discount a treating physician's [Medical Source Statement] where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning.'"). The most detailed reasoning McCullough provided was that Tennyson gets anxious and overwhelmed, has racing thoughts and her mood destabilizes. AR 527. However, she thought these symptoms could be accommodated if Tennyson is allowed to start out slow and has time to learn info/expectations. AR 527, 529. She noted Tennyson would do well if these accommodations could be met. AR 529.

The ALJ provided limitations in the RFC to address McCullough's concerns. Those limitations include unskilled (SVP 1-2) work that is routine and repetitive, does not require extended concentration or attention, does not require her to set goals or deal with job changes and avoids constant, frequent or intense social interaction with coworkers, supervisors or the general public. AR 16. These limitations are consistent with McCullough's treatment notes, which do not indicate that Tennyson's impairments are disabling. McCullough often described Tennyson's attention and focus as "adequate," "good" or "improving." AR 462-66, 506-13. She also noted at nearly every appointment that her thought processes were logical, organized and goal-directed. AR 421-23, 428-33, 438, 462-66, 505-14. McCullough was also supportive of Tennyson's job search. On February 10, 2010, she remarked, "She is realizing that she needs to go get at least a part-time job to help improve not only her financial situation

but her self-esteem." AR 423. On February 3, 2011, McCullough also encouraged her to go to some meetings for supportive adult contact. AR 508. Because the ALJ's RFC includes limitations that are consistent with McCullough's concerns and treatment notes, I find the ALJ's decision remains supported by substantial evidence in the record as a whole when considering this additional evidence.

As for the evidence from Eastham, I also find this evidence does not undermine the ALJ's decision. First, a finding of disability by Vocational Rehabilitation Services is not binding on the Commissioner. *See* 20 C.F.R. § 416.904 ("[A] determination made by another agency that [a claimant is] disabled or blind is not binding on us."). Second, the ALJ considered the records from Vocational Rehabilitation which indicated that Tennyson had successful stints in volunteer positions, but would quit when she learned she was not eligible to be paid. AR 21, 250, 253. The ALJ also noted that Tennyson would limit the hours she was willing to work for the Goodwill assessment. AR 21, 248, 493. Furthermore, the Vocational Rehabilitation notes indicate that Tennyson's file would be closed as "disability too significant to benefit from VR services" if she did not complete the Goodwill assessment. AR 274. Eastham's letter simply confirms that Tennyson's file was closed when she did not complete the Goodwill assessment. The ALJ discredited Tennyson's statements that she was not able to complete this assessment due to difficulty working around others based on the multiple bus rides she took to Wyoming which required extended periods of time around others. AR 21. Because the ALJ considered the Vocational Rehabilitation evidence and discredited it for good reasons supported by substantial evidence, I find that the ALJ's decision remains supported by substantial evidence when considering the additional evidence from Eastham.

## C. *Tennyson's Credibility*

Tennyson argues the ALJ erred in assessing her credibility because she "cherry picked" examples from the medical record when Tennyson was doing better and de-

emphasized instances where she was doing poorly. She argues this analysis is flawed because Tennyson's impairment, by its very nature, causes her to experience fluctuations. She also argues that she cannot be discredited for failing to comply with treatment because that is also related to her mental impairment. Finally, she points out that neither Dr. Toddy nor McCullough found she was malingering and the ALJ's insinuation that Tennyson is lazy is not supported by the record.

The Commissioner points out the ALJ adopted several limitations consistent with Tennyson's allegations and only discredited her to the extent Tennyson argued those limitations prevented her from performing any work. She argues the ALJ provided good reasons supported by substantial evidence for discrediting Tennyson's allegations of disability.

The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322. The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). The ALJ does not need to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh*, 222 F.3d at 452. The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnart*, 393 F.3d 798, 801 (8th Cir. 2005).

The ALJ discredited Tennyson for several reasons. AR 21. The ALJ found she stopped taking her medications and made no effort to work after she was denied disability in May 2009 and only resumed her medications and sought assistance through Vocational

Rehabilitation when she re-applied for Social Security. *Id.* She discredited Tennyson's alleged inability to work around others based on the bus rides she took to Wyoming, which required extended periods of time around others. Furthermore, the ALJ found Tennyson's allegations were not supported by the medical evidence or her daily activities. For example, McCullough noted that Tennyson had good attention, concentration, insight and judgment at nearly every appointment and treatment notes from McCullough and Dr. Toddy revealed her symptoms were well-managed when she was compliant with medication. *Id.* As for her daily activities, the ALJ noted Tennyson was able to care for her child, ride the bus, attend to personal grooming and simple household chores, use the computer, spend time reading during the day and make extended trips to Wyoming.

I find the ALJ provided good reasons supported by substantial evidence in the record as a whole for discrediting the severity of limitations alleged by Tennyson. I find little support for Tennyson's argument that the ALJ engaged in "cherry-picking." The example of "cherry-picking" provided by Tennyson involves an ALJ who discredited a treating physician's opinion that a claimant had marked limitations because the claimant "responded well to treatment." *See Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011). The court found these two things were not necessarily inconsistent and it reflected a misunderstanding of mental illness. *Id.* The court stated, "The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Id.* The ALJ was not permitted to "cherry-pick" from mixed results to support a denial of benefits.

Here, the ALJ did note that Tennyson's symptoms were managed when she was compliant with medication, but she also provided several other reasons for finding that Tennyson's limitations could not be considered disabling. She stated that despite Tennyson's assertions that she was unable to sustain attention and concentration, McCullough often found Tennyson had good attention and concentration, insight and judgment. AR 21. Indeed, McCullough noted Tennyson's attention and focus were

25

"adequate," "good" or "improving" on all but two visits. AR 430, 462-66, 506, 503-13. In those two visits in September and November 2010, McCullough was adjusting Tennyson's ADHD medication because she thought Tennyson's diminished attention and focus were due to limited coverage with her ADHD rather than anxiety. AR 511-12. At her next appointment in December, Tennyson's attention and focus were described as "good" again. AR 510. McCullough also indicated on numerous occasions that Tennyson had a stable mood, good insight and judgment and a logical, organized and goal-directed thought process. The ALJ acknowledged the records that referenced racing thoughts, anxiety and depression, but pointed out McCullough had stated Tennyson's sadness was "more situational" and she had a lot of time on her hands. AR 505. The ALJ also considered Dr. Toddy's treatment notes which contained similar observations of Tennyson's symptoms. She noted that he had assigned GAF scores of 56 and 58 in August and September 2010, with no remarkable findings on exam and intact attention and concentration. AR 478-81. At most, Dr. Toddy found her attention and concentration were "mildly" or "somewhat" impaired. AR 481-82, 486. Dr. Toddy's treatment notes also indicated Tennyson's symptoms were generally associated with family matters. AR 20, 483, 487-88, 490-92.

In addition to the medical records, the ALJ also considered Tennyson's daily activities. She noted that Tennyson provided care for her daughter, rode the bus to destinations, attended to personal grooming and simple household chores, spent time reading during the day and on the computer and was well enough to make at least two extended trips to Wyoming. AR 21. The ALJ found these activities contradicted Tennyson's claims that she would not be able to tolerate stress or work around others. AR 21-22.

Finally, the ALJ found the Vocational Rehabilitation records did not support Tennyson's allegations of disability. These records demonstrated Tennyson limited the number of hours she was willing to work and would quit volunteer jobs when she learned they were not eligible for pay. AR 20, 55, 493. Tennyson attempted a workplace

assessment at Goodwill, but said she could not handle working around others. AR 54. The ALJ discredited these assertions by referencing Tennyson's trips to Wyoming, where she traveled by bus and stayed for as long as three weeks to one month. AR 21. She also noted Tennyson continued to seek avenues of income that did not require her to engage in work activity. Indeed, Tennyson only participated in Promise Jobs because it was a requirement for receiving benefits. AR 51-52. The ALJ also remarked that Tennyson appeared to be unmotivated based on her statement at the hearing that she "will never be able to work full-time since she has not been able to do so for many years and cannot change that."[9]

I find that the ALJ's analysis of Tennyson's credibility does not constitute "cherry-picking," but reflects a thorough consideration of the record as a whole. The ALJ discredited Tennyson's allegations of disabling limitations based on a review of the medical records, Vocational Rehabilitation records and daily activities. However, she did adopt several of the limitations identified by Tennyson and her medical providers, which are supported by the record as a whole. *See Tindell v. Barnhart*, 444 F.3d 1002, 1006 (8th Cir. 2006) (upholding an ALJ's credibility determination, and noting that the ALJ did not fully discredit all of the claimant's complaints but included supported subjective limitations in the RFC assessment). The ALJ's analysis of Tennyson's credibility is supported by substantial evidence in the record and therefore, I must defer

---

[9] This reason, based on this statement, is directly contradicted by the record. The transcript from the hearing indicates Tennyson stated, "I don't think I will ever be able to work full time." AR 70. The ALJ asked why and Tennyson responded:

> I just don't feel like I have it within me to be able to complete something like that. I have not been able to for years, and that's before I knew I had problems. And it's not because there's not a willingness there. There is a willingness there, but that's just the kind of life that I have right now. There's no way I can change that. If I could, I would.

AR 70-71. As such, I will not consider this to be a reason that supports the ALJ's credibility finding.

to the ALJ's credibility determination.  *See Guilliams*, 393 F.3d at 801 ("we defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence.").

## VI.    CONCLUSION AND RECOMMENDATION

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **affirmed** and judgment be entered against Tennyson and in favor of the Commissioner.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Civ. P. 72.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 10th day of February, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE